From Homer L. Kreider, Harrisburg, Pa.

---

## Ford v. A. E. Dick Company.

*Workmen's compensation—Self-inflicted injury—Declarations of deceased against interest—Evidence.*

1. Declarations against interest need not be a part of the *res gestæ* to be admissible in evidence.

2. Declarations of a workman as to his injuries before his death, if against his interest, are of great probative value and may not be ignored.

3. A finding that a workman cut his throat, and that his subsequent death resulted therefrom, is proper where it is supported by his own declarations that he cut his throat and by the medical testimony in the case.

Hearing *de novo.* Appeal by the defendant from the decision of the Workmen's Compensation Board affirming the decision of the referee. C. P. Schuylkill Co., July T., 1924, No. 310.

*Roger Dever,* for claimant.

*Laurence E. Rupp* and *W. L. Kramer,* for defendant.

KOCH, J., April 19, 1926.—The defendant's contention is that the finding of the main fact in the case is not warranted by the evidence, and insists that the defendant intentionally inflicted upon himself the injuries which resulted in his death.

Section 301 of the Workmen's Compensation Act of June 2, 1915, P. L. 736, 738, provides: "That no compensation shall be made when the injury or death be intentionally self-inflicted, but the burden of proof of such fact shall be upon the employer." The plaintiff insists that the defendant has not met the burden of proof so placed upon it by the act of assembly.

The defendant excepts to the following findings of fact:

"1. On Nov. 4, 1921, at five minutes after six, the deceased was found by Frank Steibler, a fellow-employee, lying on a bench besides the steam shovel with his throat cut. In answer to a question, the deceased said he had cut his throat with a pocket-knife. He repeated this statement several times, and when asked who told him to do it, replied, 'Neil Ferry.' Neil Ferry had never told the deceased to cut his throat.

Ford v. A. E. Dick Company.

"2. The deceased was removed to a hospital, where he remained until Nov. 14, 1921. He died on that date of pneumonia, the contributing cause of death being his lacerated larynx.

"3. While in the hospital deceased was delirious part of the time.

"4. The defendant's foreman, William Fox, made a search of the premises, but did not find any pocket-knife or other implement by which the wound of the deceased might have been inflicted.

"5. The defendant has not proved that the injury which caused death was intentionally self-inflicted. The deceased met with an accidental injury while in the course of his employment, by which he sustained a lacerated larynx, which contributed to his death."

The legal conclusion drawn from such facts is also made an exception, that conclusion being "That since decedent met with an injury while in the course of his employment, which contributed to his death, and which defendant did not prove intentionally self-inflicted, the dependents are entitled to compensation."

This case came up here for hearing once before, and was sent back because we thought the evidence insufficient to sustain findings similar to those just quoted. A hearing de novo was then had before the same referee, and he took additional testimony and again found in favor of the claimant. Such finding has been affirmed by the Workmen's Compensation Board.

Neil Ferry, whose name is referred to in one of the above findings, lives in McAdoo, is fifty years old and knew Jerry Ford, the decedent, ever since Ferry can remember anything, and was on friendly terms with him. Ferry testified at the hearing de novo that he never told Ford to cut his throat. Ferry was evidently called at the hearing de novo to overcome the testimony of Frank Steibler, who had discovered Ford with his throat cut on Nov. 4, 1921, and Steibler testified that the decedent told him that he cut his throat because Neil Ferry had told him to do so. But, according to William E. Fox, there are two Neil Ferrys in McAdoo, and there is no testimony to show whether the Ferry who testified in this case is the one referred to by Ford.

William Thomas, another witness who was called at the hearing de novo, testified that he knew Jerry Ford; met him going to work on the day before they found him with his throat cut, and saw nothing unusual about him. Ford had been jovial and in good humor.

This is about all the competent evidence that was presented by the claimant before the referee on the hearing de novo.

The first four findings, as stated above, are supported by all the testimony in the case, but we think the fifth finding is not supported by the testimony. We think the testimony clearly shows that the decedent cut his own throat.

We will quote from Dr. L. C. Gaughan, the first physician who saw the decedent after his throat was cut. The doctor, inter alia, testified as follows: "I gave him first-aid by checking the flow of the blood as much as possible before I sent him there (to the hospital), and I asked him how this happened, and he said he cut himself with a knife," and he said it loud enough so that "any one near there could have heard." "Q. Did you see him after he was taken to the hospital? A. No, I did not. When I asked him 'How did you get this?' he said that he had cut himself, and I said, 'Why did you do that, Jerry?' and he closed his lips and refused to say anything further. Q. You went there and asked Jerry Ford how this happened, and he said he cut himself with a knife? A. Yes, sir; but refused to answer the next question." The reply to the next question was that the response was "just a facial expression and a determination not to answer." "Q. What is the difference between a facial

expression not to answer and a facial expression not caused, or rather caused, by another condition? A. When I am looking at a patient answering the question willingly, and when I put the second question to him and he refuses to answer, I judge there was some condition arose in his conscious mind that he should not answer; that possibly there was something he did not want me to know."

William E. Fox, the defendant's foreman, who was called by the claimant as a witness, *inter alia*, testified as follows: '"Q. Were you present when the decedent made a statement alleging that Ferry had something to do with this wound? A. He said Ferry told him to do something." He testified that there are two Neil Ferrys in McAdoo. This witness made search of the premises, but found no implement by which the wound was inflicted. "Q. You have testified that Jerry Ford told you that he cut his throat because Ferry told him to; you testified that Jerry Ford said that Neil Ferry told him to—he told him to do it? A. Yes, sir. Q. Will you tell—just relate word for word as you can remember just exactly what Ford did say in this line. What did he say about Neil Ferry? A. When he mentioned that he was in the engine-house there, and his boy—I do not remember which one—a young lad, who was the only one that came there, had sent word, I had sent word to his home, and when this boy had come and I took the boy to see him, and he said, 'Pop, what happened you,' and he said, 'I got my throat cut,' and he said, 'Who done it,' and he said 'myself,' and then he said, 'Who told you to do it?' and he said 'Neil Ferry.' " Fox knew Jerry Ford for forty years, and he knows Ferry and he knows of no quarrel between them. "Q. Is it your opinion that Jerry Ford was in his right mind when he said that? A. I couldn't say; he spoke straight enough to me; he could speak all right. He spoke straight enough to me as soon as I met him . . . after the accident; before we took him to the top; he was down in the hole. Q. When you first saw him, he was down in the pit? A. Yes, sir. Q. What did you say to him? A. As soon as I got to the shovel I said, 'Jerry, what happened to you?' he said, 'I cut my throat.' He said, 'Didn't you hear the whistle blow?' I said, 'What did you blow the whistle for?' and he said 'for help.' "

The stripping in which Ford worked was about 1100 feet long and 200 wide.

Frank Steibler, who was called by the defendant, testified that he went to work at five o'clock in the morning and was the first man to find Ford and no one else was about. He had missed Ford on top of the stripping and went down into the stripping and spied a light on the shovel (steam shovel) and found Jerry Ford on his back on a bench. He thought Ford was asleep and hollered at him to get up and then Ford answered. "Q. When he answered you, what did he say? A. Told him to get up and get ready for steam, and he said, 'I can't,' and I said, 'What is the matter, are you sick?' and he said, 'No, I cut my throat,' and I said, 'What?' and he said, 'I cut my throat,' and he just merely said, 'Go to hell.' And I said to myself, 'You did not.' I said, 'How did you do it?' and he said, 'With a pocket-knife,' and I said, 'When?' I said, 'When did that happen?' and he said 'fifteen after eleven.' " Steibler then put a big coat over Ford and sought for help. He knows of no robberies around the property, and said, "I do not think there is anything to steal, excepting a car or a lokey."

Such testimony conclusively proves that the injury was intentionally self-inflicted, and it does not support the contrary finding. The Workmen's Compensation Law is not intended to force a charity upon an employer; it is intended to compel him to make compensation to employees injured in the

course of their employment, excepting in cases where the injury is intentionally self-inflicted, or where the injury is caused by the act of a third person intended to injure the employee because of reasons personal to him, not directed against him as an employee or because of his employment: Section 301, Act of June 2, 1915, P. L. 736, 738.

The Workmen's Compensation Board is of the opinion that the decedent did not know what he was saying when he said he cut his throat. The evidence of Steibler, Dr. Weterau and Fox does not support such a conclusion. All of these men testified to his sanity. Ford's declarations were against his interest, and they are of great probative value and may not be ignored. Declarations against interest need not be part of the *res gestæ:* 4 Modern Law of Evidence, Chamberlayne, § 2769. "The admission is received, although it was not considered by the declarant, at the time it was made, as being opposed by his interest:" 4 Modern Law of Evidence, Chamberlayne, § 2770. The declarations against his interest were clearly admissible and are of much probative value: Wiley v. Christ, 4 Watts, 196-200.

We may not again remit this case to the Workmen's Compensation Board: Riley v. Carnegie Steel Co., 276 Pa. 82.

The decision of the Workmen's Compensation Board is reversed and judgment is entered in favor of the defendant.

From M. M. Burke, Shenandoah, Pa.